UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. ____________________

SANTIAGO CAIRO,

Plaintiff,

v.

GREGORY GERBASI, JEFFREY L. YERIAN,
RYAN C. FISHER, JOEL DORY,
JEAN R. FORGES, and RIC L. BRADSHAW,
in his official capacity as Sheriff of
Palm Beach County, Florida,

Defendants.
_____________________________________________/

FILED BY [signature] D.C.
AUG 17 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Santiago Cairo sues Defendants and alleges:

**NATURE OF THE ACTION**

1. This is a civil rights action under 42 U.S.C. § 1983 for violations of the Fourth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, arising from the warrantless arrest of Santiago Cairo on October 16, 2025, by deputies of the Palm Beach County Sheriff's Office, and from the prosecution initiated against him on a probable cause affidavit that omitted and misrepresented material exculpatory facts known to the affiant at the time of swearing. Mr. Cairo was arrested while he was the complaining party on an active 911 call reporting a suspected burglary at his home. He was charged with aggravated assault with a firearm. The State Attorney's Office declined to file the charge on November 18, 2025, for insufficient evidence.

2. Mr. Cairo brings claims for false arrest, malicious prosecution, and unlawful seizure and retention of property under the Fourth Amendment against the individual defendants, and

claims for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978), against the Sheriff in his official capacity.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3), because the claims arise under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

4. Venue is proper under 28 U.S.C. § 1391(b) because all defendants reside in this District and the events giving rise to the claims occurred in Palm Beach County, Florida, within the Southern District of Florida, West Palm Beach Division.

## PARTIES

5. Plaintiff Santiago Cairo is a natural person and a resident of Broward County, Florida. At the time of the events alleged herein, Plaintiff resided in Palm Beach County, Florida.

6. Defendant Gregory Gerbasi (#9545) was at all relevant times a detective employed by the Palm Beach County Sheriff's Office, acting under color of state law. Gerbasi was assigned to the investigation and arrived on scene only after Plaintiff had already been arrested and handcuffed. He is sued in his individual capacity.

7. Defendant Jeffrey L. Yerian (#8037) was at all relevant times a sergeant employed by the Palm Beach County Sheriff's Office, acting under color of state law. He is sued in his individual capacity.

8. Defendant Ryan C. Fisher (#43371) was at all relevant times a deputy employed by the Palm Beach County Sheriff's Office, acting under color of state law. He is sued in his individual capacity.

9. Defendant Joel Dory (#7784) was at all relevant times a deputy employed by the Palm Beach County Sheriff's Office, acting under color of state law. He is sued in his individual capacity.

10. Defendant Jean R. Forges (#7768) was at all relevant times a deputy employed by the Palm Beach County Sheriff's Office, acting under color of state law. He is sued in his individual capacity.

11. Defendant Ric L. Bradshaw is the Sheriff of Palm Beach County, Florida, and is the final policymaker for the Palm Beach County Sheriff's Office. He is sued in his official capacity.

**FACTUAL ALLEGATIONS**[1]

12. On the evening of October 16, 2025, Plaintiff was at his home at 6371 Boca Circle, Boca Raton, Florida, in unincorporated Palm Beach County. Plaintiff is a licensed concealed-weapon permit holder with no criminal history.

13. At approximately 19:49:55, Plaintiff left his residence on foot to walk his two dogs, one of them elderly and disabled and using a wheeled mobility cart, as captured on his entrance camera. Approximately five minutes later, at approximately 19:55:20, three individuals approached the residence. Two of them went together to Plaintiff's front door and pounded on it at the same time, while the third remained back in the front yard. At approximately 19:55:33, pounding on the front door is audible on Plaintiff's camera audio, and at approximately 19:55:33 to 19:55:34 all three individuals fled on foot across the neighboring front yards. R.K. later admitted this first approach to deputies on scene, stating, "First time, it was me, and then second time, it was my friend," and confirming "Yeah" when a deputy asked whether it was the "Same door, this guy's door." Approximately ninety seconds after the first approach, at approximately 19:57:07, a

[1] The minor witnesses are identified by initials in accordance with Federal Rule of Civil Procedure 5.2.

single individual returned to the same door. That individual had pulled his shirt up over his face to conceal himself and carried a handheld flashlight, turned off, as he approached. He reached for the door handle, as Plaintiff observed both directly and on his live camera feed, then crouched low, below window height, beside the door and held that position. At approximately 19:57:10, Plaintiff called out from a distance, as captured on the audio of multiple of Plaintiff's exterior cameras; the individual rose at the sound of Plaintiff's voice, and the group fled before the door was opened. The two approaches differed materially: the first was made by three individuals, upright and unconcealed, two of whom pounded on the door together before all three immediately ran; the second was made by a single individual with his face covered and his flashlight off, who reached for the handle and crouched below the window line beside the door.

14. The neighborhood had experienced prior break-ins, including a July 2025 vehicle burglary, as corroborated by the notarized affidavits of neighbors Aydin Onur Aydin and Mark Silvers. Two days earlier, on October 14, 2025, a suspicious male had emerged from the neighborhood hedge line and approached a neighbor, who feared for her safety and called 911, as corroborated by the signed statement of neighbor Jennifer M. Pusins. Neighbor Mary Beth Hall further states that two to three weeks before the incident, Plaintiff had shown her his surveillance video of individuals methodically checking the door handles of parked cars in the neighborhood.

15. Believing a burglary was in progress, Plaintiff called 911 at 19:57:49, thirty-nine seconds after calling out, while making his way back toward his residence. Slowed by the disabled dog's mobility cart, he took approximately a minute and a half to reach the home, where he secured the dogs and retrieved his firearm. Plaintiff exited his residence at approximately 20:00:10, as captured on his entrance camera, carrying a handheld flashlight and his firearm, both directed downward toward the ground. Three minutes elapsed between Plaintiff's call-out at 19:57:10 and

his return outside at 20:00:10. He remained on the line with the dispatcher for nine minutes, until after deputies had arrived and secured R.K., as reflected in Plaintiff's carrier call records. Plaintiff told the dispatcher that he was armed, and dispatch broadcast that information to responding units.

16. While on the 911 call, at approximately 20:01:31, Plaintiff encountered one member of the group, a juvenile referred to herein as R.K., behind a neighboring residence approximately 150 feet from his home. That encounter occurred more than four minutes after the group fled Plaintiff's door, and approximately eighty-one seconds after Plaintiff stepped back outside, an interval consistent with walking that distance and inconsistent with pursuit. The Sheriff's Office's own offense report placed the distance at approximately 200 feet. Plaintiff's camera system captured where R.K. had been hiding; captured Plaintiff walking, not running, to the rear of neighbor Mark Silvers's home to check whether anyone had entered it and to speak with him; and captured R.K. walking away from the area unimpeded, then turning around and walking toward Plaintiff and Mr. Silvers as they spoke.

17. Plaintiff detained R.K. and held him for law enforcement while remaining on the 911 call. He directed a handheld flashlight at R.K. and kept his firearm at his side in a low-ready position. While Plaintiff was detaining R.K. and deputies were en route, the dispatcher instructed Plaintiff to secure the firearm; he complied, and the dispatch log records that the complainant advised he had secured it. The Sheriff's Office's own offense report states that Plaintiff "repeatedly denied pointing the firearm" and that a weapon-mounted light was on the firearm.

18. Neighbor Mark Silvers was present and, in a notarized affidavit, states that he never saw Plaintiff point a firearm at anyone, that Plaintiff held only a flashlight toward R.K., and that Plaintiff remained on the phone with 911 until police arrived. Neighbor Aydin Onur Aydin likewise attests by notarized affidavit that he never saw Plaintiff point a firearm. Neighbor Ismael

Garlobo's Ring camera captured the encounter with audio and video, including R.K.'s statement during the encounter, "You were pointing at me," and Plaintiff's contemporaneous reply, "I was never pointing at you." Garlobo was not present during the encounter; he reviewed his camera's recording. He attests by notarized affidavit that the video shows that from the moment R.K. emerged from the bushes until law enforcement arrived, Plaintiff "never points, displays, or brandishes any weapon of any kind," and that throughout the footage Plaintiff's demeanor "remains calm, composed, and non-aggressive." The 911 recording captures the same facts in real time. Asked by the dispatcher to secure the weapon, Plaintiff complied and confirmed, "Weapon secured." Asked "you're not pointing it at him anymore, right?", Plaintiff answered the dispatcher, "No. I was never pointing it at him. It's always at the ground." In the same breath Plaintiff turned to R.K. and told him directly, "I was never pointing it at you. It's right here on the ground. There's a laser right on it. You would be able to tell," inviting R.K. to confirm the weapon's downward orientation for himself. Both statements were recorded on the emergency line as the encounter was occurring. The emergency line also documented the presence of these witnesses in real time: asked by the call-taker, "Okay, how many people are with you? How many neighbors?", Plaintiff answered, "Three people. I got three people, three neighbors with me." The agency's own recording therefore established, as deputies were arriving, that multiple neighbor witnesses were present at the scene.

19. Palm Beach County Sheriff's Office units responded. Per the agency's Computer-Aided Dispatch records, numerous units were dispatched within seconds of one another beginning at approximately 20:02, and Defendant Yerian was among the supervisory personnel on scene from the outset. The dispatcher-keyed radio log reflects Defendant Dory's unit arriving at approximately 20:05 and reporting one subject secured at approximately 20:06. Defendant Dory

personally detained and handcuffed R.K.; in his later sworn interview, R.K. identified "Officer Dory" by name as the deputy who handcuffed him, searched him, and placed him in a patrol vehicle.

20. Before Plaintiff was arrested, he told responding deputies, on body-worn camera, that R.K. was not the individual who had approached his front door but was part of the group that had approached, offered his home surveillance footage, and identified a neighbor witness. Deputies viewed portions of that footage inside Plaintiff's home before the arrest, asking Plaintiff to replay segments and to display additional camera angles. After Plaintiff denied pointing the firearm and stated that the firearm had remained pointed at the floor, one deputy responded, "No, I believe you." Another deputy asked Plaintiff how far he had "chased" the juvenile; Plaintiff answered that he did not chase him. Defendant Fisher was present inside Plaintiff's home during these statements, heard Plaintiff deny pointing the firearm, and relayed information by radio to Defendant Yerian. As deputies exited Plaintiff's residence after viewing the footage, Defendant Fisher's body-worn camera (serial D01AG774Z) recorded deputies discussing what the footage showed. In that exchange, recorded shortly before 20:14:25, one deputy stated, in substance, that the kids came to the door and that he just tripped; Defendant Fisher stated, in substance, that he tripped but did not even touch it; and Defendant Forges, speaking on a cellular telephone, stated, in substance, that he did not even touch the door. At 20:14:25, eleven minutes and fifty-nine seconds into the recording, the camera's on-screen indicator changed to "MUTED" and the audio ceased while Defendant Forges's telephone report was in progress. At 20:33, while deputies remained on scene, Plaintiff telephoned Ms. Hall to warn her of the attempted break-in, as reflected in Plaintiff's carrier call records. Ms. Hall confirms in a signed statement that Plaintiff called to

tell her individuals had just attempted to break into his front door and that he had already called 911.

21. Deputies initially detained R.K. in handcuffs in a patrol vehicle as the suspect in the burglary Plaintiff had reported. Deputies subsequently released R.K. after reviewing Plaintiff's surveillance footage. The interior camera of Defendant Dory's patrol vehicle (Axon Fleet 3, serial X694D22QR) captures the release: R.K. appears at the open rear door of the vehicle with a deputy at 20:15:30, and by 20:16:12 he is seated in the vehicle, unrestrained, using his cellular telephone, typing on a messaging interface at 20:16:19 and 20:16:23 and displaying a video application by 20:16:30, all before any recorded victim interview was conducted. Ms. Hall, who came to the scene at a deputy's request to care for Plaintiff's dogs, states that for the remainder of the evening R.K. and his younger sibling moved freely about the scene and their mother's vehicle with full access to their cellular telephones, while Plaintiff remained handcuffed in a patrol vehicle, and that she counted twelve law enforcement vehicles in the neighborhood. The Sheriff's Office's own offense report states: "After reviewing the available information and video footage, it was determined that [R.K.] had not committed a crime and he was subsequently released." The same footage was never collected as evidence. The charging affidavit characterized it as not showing an attempted entry, while omitting that deputies had relied on that very footage to clear R.K. of the burglary Plaintiff reported.

22. Neighbor Jennifer M. Pusins arrived home at approximately 20:08 and observed deputies walking a handcuffed juvenile from behind a neighboring residence. At approximately 20:15, roughly forty-five minutes before Plaintiff was handcuffed and before any deputy had interviewed the eyewitness or Plaintiff, a deputy told Ms. Pusins that the matter "was a misunderstanding regarding kids potentially breaking into cars" and that "the accusation was

unfounded," volunteering that it was "possible the kids were walking and dropped something by a car which could explain why they were near a vehicle." Ms. Pusins states that the deputy offered explanations for the reported conduct rather than treating the report as a matter to be investigated.

23. Successive rounds of on-scene questioning of R.K. followed his release. In the first, recorded group questioning by deputies beginning at approximately 20:17, within about two minutes of his release, and captured on Defendant Dory's body-worn camera (serial D01AE786P) as well as on Defendant Forges's camera, a deputy asked R.K. whether Plaintiff had run after him; R.K. answered, in substance, that Plaintiff had not, and stated that when he saw deputies arriving he ran up to them himself. A second interview, beginning at approximately 20:37, was captured on Defendant Forges's body-worn camera (serial D01AE730P); during that interview, at 20:39:51, Defendant Forges, who later authored the initial offense report, is recorded stating, "It's very weak. It's very weak.", approximately seventeen minutes before Defendant Yerian directed Plaintiff's detention. Forges's report contains no reference to that assessment. In a third interview, at approximately 20:43, Defendant Yerian interviewed R.K. Plaintiff was not under arrest at that time. During that interview, R.K. named his two companions, E. and T.S., to Yerian. Neither companion was contacted that night or at any time thereafter. In the on-scene interviews, R.K. also admitted that he himself had knocked on Plaintiff's door earlier that evening, stating, "First time, it was me, and then second time, it was my friend," and confirming that it was the same door when asked.

24. The subjective-fear element of the offense later charged was elicited from R.K. by leading question. On Defendant Yerian's body-worn camera (serial D01AH5613), when first asked what Plaintiff was doing with the firearm, R.K. answered with a gesture, "Like probably like this, not fully, like this," and described the firearm as directed "towards the ground, towards

my feet." Yerian then asked, "Did it point at you?", followed at 20:46:46 by "So he pointed the gun at you?" and, seventeen seconds later, at 20:47:03, "Did you think you were gonna get shot?", to which R.K. answered "Yes."

25. At approximately 20:57, Defendant Yerian directed that Plaintiff be detained and placed in a patrol vehicle, stating on body-worn camera, "Ryan, let's go detain this guy, and we're going to stuff him in somebody's car." At or about the same time, Yerian pressed R.K.'s mother, D.K., who is not a native English speaker, to decide whether to pursue charges, asking her on body-worn camera, "Do you want this guy to go to jail for that? Because that's a felony," and stating in the same exchange, "It's an aggravated assault with a deadly weapon." The charge was thus named to R.K.'s mother before any investigative interview had been conducted. Yerian pressed her for an immediate answer, stating, "I need to know in the next five minutes" and "We need to get him in handcuffs." The Sheriff's Office's own offense report confirms that D.K. "was advised that the decision to pursue charges would be hers." In the same exchange, D.K. stated, "But that's the boy's fault. They were going around knocking on the door." That statement appears in no charging document.

26. At approximately 20:59, roughly two minutes after Yerian's direction, Defendants Fisher and Forges placed Plaintiff in handcuffs. The handcuffing is visible at 20:58:38 on Defendant Forges's body-worn camera, serial D01AE730P, in a recording beginning at 20:55:28 that the agency titled "NO EVIDENCE" (produced to Plaintiff as "(REDACTED)_NO_EVIDENCE-2.mp4"). According to the agency's own evidence metadata, that device was the only camera on the scene recording at that moment, and no device on the scene recorded at all during the three minutes preceding that recording's activation, from 20:52:16 to

20:55:28. The arrest decision was made and carried out before any probable cause affidavit was drafted and before the assigned detective arrived on scene.

27. Deputies did not question the eyewitnesses present at the scene. Both eyewitnesses left the scene without being interviewed, and no deputy took a statement from either before Plaintiff was handcuffed. Deputies did not examine the rear areas of the residences where the reported activity occurred, and no report documents any examination of those areas.

28. Defendant Yerian instructed fellow officers, on body-worn camera, not to "go down any rabbit holes with interviews or searches." Contemporaneously, before Plaintiff was handcuffed, a deputy narrated the incident to R.K.'s mother on body-worn camera in the following terms: that Plaintiff "came out of his house with a gun and chased him behind this building, pointed the gun at him, pushed him down to the ground, and thrown him out, made him lay on the ground," and that R.K. "thought he was going to get shot." No part of that account appears in any recorded witness statement from that night. R.K. himself denied being chased, denied that Plaintiff ran after him, and stated that he went to his knees on his own after being told to do so. The word "chased" does not appear in R.K.'s recorded statements that night.

29. At approximately 21:53, nearly an hour after Plaintiff was handcuffed, Silvers was interviewed for the first time, in a recording captured on Defendant Forges's body-worn camera. Silvers was located and brought to deputies by Ms. Hall, whom Plaintiff, from the back of the patrol vehicle, had asked through the vehicle window to retrieve him; Silvers stated on the recording itself that the neighbor "asked me to come and give you what I know." Silvers did not confirm that Plaintiff had pointed the firearm, stating, "I can't say he pointed it at him," and, later in the same interview, "I never saw the gun and I can't say he was pointing it at him at any point." Asked whether the firearm was displayed, Silvers demonstrated the weapon's position for the

deputy with his own hand rather than describing it in words. The recording captures the demonstration; the corresponding transcript breaks off mid-sentence at that moment, reading, "I know he had it, whether it was like in his hand by his." Silvers immediately added that Plaintiff "wasn't like waving it around or anything that I saw." The demonstration is visible only on the video, and is described in no report or charging document. Silvers described the item he asked Plaintiff to lower as the flashlight, which Plaintiff was directing at R.K. so that he could keep him in view, and stated that R.K. "was kind of like wanting to leave" and that he and Plaintiff were "trying to keep the kid from running away" until deputies arrived. In the same interview, Silvers told deputies that R.K. had triggered Silvers's own security light, had appeared at Silvers's own front door, and had been moving around behind Silvers's residence in the dark; that Silvers's door had been kicked in previously; and that Silvers did not believe the prank explanation. Mr. Aydin was not interviewed at any point that night. On information and belief, no deputy or other Sheriff's Office personnel ever questioned or contacted the neighbor who retrieved Silvers, either that night or at any time since. Defendant Forges authored the initial offense report, dictated at approximately 23:00 that night, roughly an hour after the Silvers interview was recorded on Forges's own camera. That report does not mention Silvers or his statement anywhere in its narrative, and its administrative section records "WITNESS TO CRIME KNOWN? N."

30. Defendant Gerbasi did not arrive on scene until approximately 22:30, more than ninety minutes after Plaintiff was handcuffed. Gerbasi's own offense-report supplement states that "the suspect, Santiago Cairo, was already handcuffed in the back seat of a marked patrol vehicle prior to my arrival."

31. Gerbasi's offense-report supplement also states that he "was contacted by [his] immediate supervisor to respond." The agency's Computer-Aided Dispatch records reflect that

Gerbasi self-dispatched at 21:27:16, and the Sheriff's Office has produced no record of any call between the on-scene deputies and Gerbasi that night, and has certified that it has no MDT message, radio communication, or written note relating to the arrest decision made prior to Gerbasi's arrival. In a further written response dated June 16, 2026, the Sheriff's Office stated: "Per the carrier records there are no calls on the date in question between the on scene Deputies and the Detective." The same records reflect an arrival time for Gerbasi of 00:55:18 on October 17, 2025, more than two hours after his own body-worn camera shows him conducting the sworn recorded interview described in paragraph 32.

32. At approximately 22:37, Gerbasi conducted a sworn recorded interview of R.K. During that interview, R.K. again named both companions, E. and T.S., identified T.S. as the individual involved at the front door, and provided T.S.'s telephone number. Gerbasi never contacted T.S. or E. R.K. also stated under oath that the group had ridden bicycles to the area and, before entering Plaintiff's neighborhood, agreed to "leave the bikes somewhere," and that after fleeing Plaintiff's door he "ran into a big bush" and "tried to hide inside the bush," waiting "maybe three minutes, three, four minutes" before walking out. That admission independently corroborates the interval documented on Plaintiff's cameras between the flight from the door and the encounter, and is inconsistent with any pursuit. R.K.'s sworn account also stated that Plaintiff's first contact with him was a question called out from approximately fifty feet or more, asking whether R.K. had seen kids ding-dong ditching. That first contact is captured on the 911 recording itself: mid-call with the dispatcher, Plaintiff is heard calling out, "Hey, did you see those kids? Did you see those kids?" On the same recording, Plaintiff described the incident to the dispatcher as an attempted break-in from the opening of the call, and told R.K. directly, during the encounter, that he believed R.K. had tried to break into his home. No statement by Plaintiff on the 911 recording

refers to ding-dong ditching. R.K.'s sworn account further stated that Plaintiff's firearm was "pointed to the ground or a little bit to my feet"; that when Plaintiff momentarily raised the firearm, the voice of the 911 dispatcher on Plaintiff's phone caused him to stop and point it back down; and that R.K. believed at the time that Plaintiff was probably a police officer.

33. During the same interview, R.K. stated under oath that he did not believe Plaintiff's firearm was real: "No, I did not think it was a real gun. I thought it was a BB gun." He compared it to an airsoft gun, stated that he believed that even if he ran and was shot, it was "not gonna hurt me a lot," and stated that he realized the firearm was real only when a police officer mentioned it after deputies arrived. In the same interview, when Gerbasi asked whether Plaintiff was "making you go up and down," R.K. answered, "No, he's not making me. That's my decision," and described repeatedly standing up of his own accord. R.K. also stated that he attempted to walk away. None of those statements appear in the probable cause affidavit.

34. At approximately 22:59, Gerbasi conducted a recorded post-Miranda interview of Plaintiff. The interview was captured on Gerbasi's body-worn camera (Axon Body 4, serial D01AH5476) and independently recorded by the fleet camera of the patrol vehicle in which Plaintiff was seated (Fleet 3, serial X684D254D), a recording assigned in the agency's Evidence.com system to Defendant Fisher and titled by the agency "BWC DET DALTON SPEAKING TO CAIRO," reflecting the presence of Detective Ryan N. Dalton during the interview. Plaintiff denied pointing his firearm multiple times. Plaintiff's telephone had been seized from him at his arrest; during the interview, Gerbasi returned the telephone to Plaintiff so that Plaintiff could display his home security camera footage, and Plaintiff showed Gerbasi the footage directly on the phone, offering both to email the footage to Gerbasi and to retrieve it on his home computer. Gerbasi viewed the footage and declined both offers. During the same

interview, Plaintiff referred Gerbasi by name to his neighbor Ms. Hall, telling him "you're going to ask Beth" and noting that she lived alone, and separately directed Gerbasi to Mr. Silvers, stating, "why don't we discuss it with Mark? He was there." Gerbasi interrupted him, saying, "Don't, don't listen. I'm going to do my job." In the same exchange Gerbasi told Plaintiff, "you're holding a juvenile at gunpoint for absolutely no reason that we know of right now," a statement made more than two hours after Plaintiff had been handcuffed. Gerbasi never contacted Ms. Hall. A detective did speak with Ms. Hall hours later, during the execution of the search warrant in the early morning of October 17, 2025, while that detective's body-worn camera was muted, so that no audio record of her statements exists. The same muted recording depicts that detective speaking with Plaintiff's mother at the same location. No written account of any interview of Ms. Hall appears in any report or charging document.

35. At approximately 23:28, in a recorded interview captured on a backup detective's body-worn camera, serial D01AH5993, a file the agency classified "No Evidentiary Value," Mr. Silvers told Gerbasi that he could not say Plaintiff had pointed the firearm at R.K., his second such statement that evening, and provided Mr. Garlobo's name and contact information, identifying Garlobo as a neighbor with camera footage. Gerbasi acknowledged the information and never contacted Garlobo. Nine minutes later, officers went to Mr. Garlobo's residence, where the very Ring camera Mr. Silvers had just identified was mounted. Garlobo's Ring camera recorded one plainclothes officer at 23:37:50, standing on Garlobo's property directly within the camera's field of view. The presence of the remaining officers is established not by the Ring recording but by the agency's own body-worn camera footage, which captures the same visit from the officers' side: footage from Axon body camera serial D01AH5993, timestamped 23:37:52 and 23:38:20, and footage from a second Axon body camera, serial D01AH5476, timestamped 23:37:48, 23:38:17,

23:38:20, and 23:38:42, both recorded at Mr. Garlobo's residence. Several of those frames show one officer filming another officer walking ahead of him toward the residence, and additional frames show a civilian standing on the property with them. Taken together, the agency's body-worn camera recordings establish that at least four law enforcement personnel were present at Mr. Garlobo's residence in that window, accompanied by Mr. Silvers, who had just identified the camera to Defendant Gerbasi. Camera serial D01AH5993 is the same device that recorded the 22:38 interview of R.K., the 23:28 interview of Mr. Silvers then still in progress, and the later execution of the search warrant, and that produced the files the agency classified "No Evidentiary Value." Garlobo's notarized affidavit independently attests that a police officer can be seen in the footage between approximately 11:35 and 11:38 p.m. "looking directly at my Ring camera." The camera that had recorded the encounter thus also recorded law enforcement standing before it that same night, and the agency's own body-worn cameras recorded the officers standing there. Its footage was never requested, collected, or mentioned in any charging document, and the Sheriff's Office has certified that no record of any contact attempt exists. Ring recordings are retained by the service only for a limited period before automatic deletion. The footage of the encounter exists today only because Plaintiff himself contacted Garlobo and obtained the original recordings from him; no law enforcement agency ever requested, collected, or preserved it.

36. Plaintiff was charged with aggravated assault with a firearm under Florida Statute § 784.021(1)(a). He was initially held without bond. Plaintiff was brought before a judicial officer for first appearance, at which the probable cause affidavit sworn by Defendant Gerbasi was the charging document presented to the court. The judicial officer did not release Plaintiff and instead set bond at $10,000. Plaintiff remained in custody following that judicial determination until he

posted bond, securing his release on October 17, 2025, after approximately twenty-four hours in custody, by paying a nonrefundable ten percent premium of $1,000 to a bail bondsman.

37. The probable cause affidavit Gerbasi swore concluded that, "based upon the totality of the circumstances, the statements obtained, and Cairo's own admission that he 'went too far' but understood the situation," the juveniles' attempt to enter the residence could not be confirmed. Plaintiff made no such admission. On the recording from which it purports to derive, Plaintiff's words were: "I understand what you're saying. A hundred percent. And I should have thought twice about it," followed shortly by "It's just I, I apologize," to which Gerbasi responded, "You don't have to apologize." The phrase "went too far" was not Plaintiff's. It was the detective's own characterization, spoken to Plaintiff earlier that evening on a fleet camera recording: "when you went a little too far with it and chased them down." The affidavit attributed the affiant's own words to Plaintiff as a quoted admission. The remainder of the purported admission, that Plaintiff "understood the situation," derives from Plaintiff's repeated statements that he understood what the detective was saying, offered in response to the detective's framing of the facts rather than as any concession of wrongdoing. Plaintiff denied pointing the firearm multiple times in that same recording. Gerbasi's offense report recast the same exchange as Plaintiff having "ultimately acknowledged understanding that his conduct was improper." The affidavit otherwise conceded that Plaintiff kept the firearm "in a low-ready position," "never pointed the firearm directly at the juvenile," and that the detention occurred "approximately 200 feet south of his front door." The fabricated admission was the only statement in the affidavit suggesting Plaintiff conceded wrongdoing. In its subsequent public records production, the Sheriff's Office applied six redactions, classified under the confession exemption of Florida Statute § 119.071(2)(e), to the

passages containing the purported admission, while the State Attorney's Office released identical pages unredacted.

38. The affidavit omitted material exculpatory facts within Gerbasi's knowledge at the time of swearing, each documented on the agency's own recordings: R.K.'s sworn statement that he believed the firearm was a BB gun and realized it was real only after deputies arrived; the identities of E. and T.S., both named by R.K. to Yerian before the arrest and to Gerbasi under oath, neither of whom was ever contacted; Mr. Silvers's statements, made twice, that he could not say Plaintiff had pointed the firearm; D.K.'s pre-arrest statement that the incident was "the boy's fault"; Silvers's account that R.K. had appeared at Silvers's own front door and behind his residence; the existence of Mr. Garlobo's independent Ring camera, which appears nowhere in the charging documents; and the fact that deputies had viewed Plaintiff's home security footage at the scene and relied on it to clear R.K., and that Gerbasi personally viewed that footage during the recorded interview and declined to collect it.

39. During the same recorded session, Plaintiff told Gerbasi that the individuals "came twice to the front door," and told him candidly that the entrance camera "doesn't show … when they grab the door," offering to display the footage full screen on his computer instead. Gerbasi declined. The affidavit further characterized the footage as not showing anyone attempting to open or damage the door, while omitting what the footage does show: two individuals pounding together on the front door on a first approach, and, ninety seconds later, a single concealed individual returning to the same door, reaching for the handle, and crouching below the window line beside it until Plaintiff called out. Forges's report attributed that minimizing description to Plaintiff himself, stating that Plaintiff "stated that the video showed a juvenile at his front door but making no attempt to open it," even though the same report elsewhere records Plaintiff stating that he

"believed they were attempting to open" the door, and the affidavit presented the same characterization as part of Plaintiff's own advisement. Plaintiff made no such statement. His recorded statements that night described the opposite: on scene, Plaintiff told deputies the individual "went to go grab my door open," confirmed "Oh, he touched it," and answered "Yeah, 100%" when a deputy asked whether this was after the individual opened the door; and Plaintiff told Gerbasi directly that the individual was "going up to the door and grabbing the handle" and "let go of the handle immediately" when Plaintiff yelled. Gerbasi's own recorded questions during that interview, including "Where were you at this point when he grabbed the handle?" and "How did you know that he was pulling your handle?", establish that the affiant personally knew Plaintiff's account before swearing the contrary characterization.

40. The affidavit also relayed R.K.'s claim that the group was "only knocking or ringing front doorbells and did not approach or tamper with any windows or the back of the residences," while omitting that Plaintiff encountered and detained R.K. behind a neighboring residence, that the offense report records R.K. having "attempted to hide behind a bush," and that Silvers described R.K. coming around by Silvers's residence toward the rear, an account Silvers gave to Gerbasi directly in the recorded interview. Plaintiff's own camera system captured the group approaching his front door from the backyard areas on the first approach and fleeing through backyards after Plaintiff called out during the second approach. None of Plaintiff's cameras captured the group traveling along the front driveways or the street.

41. The word "chased" does not appear in the probable cause affidavit. It appears in two documents Gerbasi authored: his internal Targeted Violence Unit log entry, emailed to Sheriff's Office command staff on October 17, 2025, which stated that "Cairo chased the juveniles through the neighborhood," and his own offense-report supplement, which characterized Plaintiff as

"actively chasing suspects with a firearm." The word appears in no spontaneous witness account. To the contrary, R.K. told deputies on body-worn camera that Plaintiff did not run after him, answering "No" when a deputy stated "he didn't run after you." Describing his own approach to Plaintiff at the encounter, R.K. confirmed a deputy's statement that he "just walked casually over to him," answering, "I didn't run, didn't do anything, casually just walked over." Both the affidavit and the initial offense report nonetheless asserted that R.K. "ran toward" law enforcement officers for safety; the arriving deputy's own body-worn camera captured R.K. walking calmly toward deputies while using his phone. The same log entry stated that "[a]fter conducting interviews with all involved parties and reviewing body-worn camera footage, Cairo was arrested." That sequence is false: Plaintiff was handcuffed at approximately 20:59, before any of the recorded interviews described above were conducted, and the "involved parties" never interviewed before the arrest included T.S., E., Mr. Aydin, Mr. Garlobo, and Ms. Hall.

42. The affidavit stated that the detention occurred approximately 200 feet south of Plaintiff's front door, framing the encounter as occurring away from Plaintiff's property. During the recorded interview, Gerbasi separately characterized Plaintiff as being "500 feet away chasing after somebody," a characterization contradicted by R.K.'s own recorded statements that Plaintiff did not run after him. Gerbasi's offense report separately records that Plaintiff first observed R.K. from approximately 30 to 40 feet. No charging document reconciles these figures, and the pursuit characterization appears in no witness account. The actual distance from Plaintiff's front door to the location of the encounter, as measured, is approximately 150 feet.

43. On October 24, 2025, Defendant Gerbasi personally met R.K.'s mother, D.K., at the Boynton Beach Police Department and obtained and witnessed her signed Refusal to Prosecute, on which Gerbasi is the attesting deputy. Gerbasi stated on his own recording that D.K. had already

told him by telephone the previous day that the family did not wish to pursue charges. D.K. stated on Gerbasi's body-worn camera that she did not wish to "press charge against that man" and considered the matter her son's "stupid joke," and Gerbasi administered an oath on her statement. Despite holding the signed, sworn refusal, Gerbasi allowed the prosecution to continue for twenty-five more days. The Sheriff's Office has since certified that it has no records referencing or responding to the sworn Refusal to Prosecute and no record of how that statement was handled after it was received.

44. The State Attorney's Office for the Fifteenth Judicial Circuit issued two written demands for evidence, dated October 21, 2025, with a stated twenty-four-hour deadline, and October 29, 2025, marked as a second attempt requiring immediate response. The agency's Evidence.com audit trail shows that Gerbasi did not share the case file with the State Attorney's Office until October 30, 2025, nine days after the first demand's deadline and the day after the second demand. The audit trail also shows that Gerbasi did not assemble the Evidence.com case file at all until October 21, 2025 at 14:15, five days after the arrest and the same day as the first demand.

45. Before declining the charge, the assigned Assistant State Attorney documented her assessment in the prosecution case file. She wrote that, based on the surveillance footage, it was reasonable that Plaintiff believed a break-in was occurring, and that the fact that Plaintiff was calling the police while trying to detain a possible suspect indicated that he believed a break-in was occurring. She further documented that there were inconsistent statements regarding whether the firearm was actually pointed at the victim, that the victim stated at one point that he did not think the firearm was real, and that the victim's own statement indicated Plaintiff was trying to

keep the victim detained until police arrived. She further documented that even if the victim and his family had cooperated, she would have recommended declining to file the charge.

46. The same Assistant State Attorney also documented that she directed Defendant Gerbasi to follow up with a neighbor, described in the prosecution file as being out of the country, who might possess Ring camera footage of the encounter. Defendant Gerbasi did not do so. On information and belief, the neighbor, Ismael Garlobo, was not out of the country; he was staying at a family residence in West Boca Raton, a short drive from the scene, and was readily available on the night of the incident, when Mr. Silvers provided his contact information to responding officers, and reachable throughout the prosecution. What Mr. Silvers actually told Gerbasi on the recording was that the neighbors were "not there right now" and that they "stay in another place sometimes and they're back and forth a little bit." No recorded statement describes Mr. Garlobo as being out of the country. The Sheriff's Office has since certified that it has no record of any attempt to contact him. Garlobo attests by notarized affidavit that his Ring camera captured the encounter and that no officer ever contacted him.

47. Plaintiff's home security system included multiple cameras covering the property from multiple angles, including the front entrance and the rear areas where the encounter occurred, and Plaintiff told deputies and Defendant Gerbasi so on the night of October 16, 2025. Every camera source described in this Complaint existed and was available to law enforcement that night. No defendant collected or preserved any of it: deputies viewed Plaintiff's footage at the scene and did not collect it; Gerbasi viewed it during the recorded interview and declined it; Mr. Garlobo was never contacted; and the agency's own audit records show that no case materials were shared with the State Attorney's Office until October 30, 2025, after its second written demand.

48. On November 18, 2025, the State Attorney's Office declined to file the charge, citing insufficient evidence. The prosecution thereby terminated in Plaintiff's favor.

49. A search warrant, PBSO_2025_008190, was obtained and executed in this matter. The warrant authorized seizure of "Firearm(s), Firearm part(s), Firearm Storage Container(s), Ammunition, Shell casings, Firearm Cleaning and Maintenance kit(s), Firearm Documentation," and did not authorize the seizure of a telephone, a cellular device, an electronic device, or digital contents of any kind. Plaintiff's cellular telephone was seized from him at the time of his arrest without a warrant, was briefly returned to him by Gerbasi during the recorded interview for the purpose of displaying the surveillance footage as described in paragraph 34, was then retaken and retained, and was logged into evidence at 5:30 a.m. on October 17, 2025. The Sheriff's Office property receipt for the telephone records it as collected at 6371 Boca Circle at approximately 1:30 a.m. on October 17, 2025, during the execution of the search warrant. The telephone had in fact been taken from Plaintiff's person at his arrest approximately four and a half hours earlier, and the warrant under which its collection was recorded did not authorize the seizure of a telephone. The telephone was retained until December 4, 2025, sixteen days after the criminal charge had been declined, when it was released to Plaintiff from the agency's crime laboratory. No warrant ever authorized the telephone's seizure or retention. Plaintiff was not provided a receipt for the seized property until approximately twenty-four to forty-eight hours after the seizure; only a search warrant relating to the pistol was left at the residence.

50. While Plaintiff was held in general population on the afternoon of October 17, 2025, awaiting release, a detective whose identity is presently unknown to Plaintiff met with Plaintiff, provided him a copy of the warrant inventory, and told Plaintiff that his cellular telephone would be returned sooner if Plaintiff provided his surveillance footage. The identity of that detective is

ascertainable from detention facility access records for that afternoon and is a proper subject of discovery.

51. The execution of the search warrant, in the early morning hours of October 17, 2025, was captured on an audio recording from a camera inside Plaintiff's home. That recording is the only audio record of what occurred inside the residence. Four detectives entered and searched Plaintiff's home. Of all the body-worn camera files the Sheriff's Office produced, only one depicts the interior of the residence, and that recording is both muted and visually blurred. Body-worn camera serial D01AG742Z records audio at the threshold at 01:11:03 and displays the indicator "MUTED" by 01:11:37, once inside. No body-worn camera produced by the Sheriff's Office recorded audio from inside Plaintiff's home at any point during the search. The statements set out below exist only because Plaintiff's own camera recorded them. On that recording, officers confirmed, while completing the property sheet, that they were taking Plaintiff's telephone; confirmed that the firearms were being taken in connection with the Risk Protection Order rather than as evidence; referred to Plaintiff as "a vigilante"; described seized items as "Christmas presents for the detective"; discussed Risk Protection Order paperwork approximately nine hours before the Risk Protection Order petition was filed with the court; remarked that "self-dispatch is clutch"; and stated, "you have to hit save as and put it under a different case." Agency records show the firearms seized under the warrant logged under multiple case numbers.

52. The Sheriff's Office seized six firearms and approximately 19.5 pounds of ammunition. One firearm was the incident weapon; the remaining five firearms were seized and held under the Risk Protection Order for safekeeping and were not involved in the underlying incident. The agency's firearms technician observed in writing that the firearms did not appear to have been used in any way, yet the agency subjected the safekeeping-held firearms to investigative

forensic processing documented in its own case report: on October 28, 2025, a NIBIN technician swabbed the Glock 23 for DNA, and on October 30, 2025, the same technician test-fired three of the firearms, the Glock 23, the Glock 19-pattern pistol, and the PWS MK1, for entry into the National Integrated Ballistic Information Network, a database used to link firearms to unsolved crimes, updating the results in the laboratory information system. The incident firearm, the Glock 43X, had itself been swabbed for DNA, test-fired using Plaintiff's own submitted magazine, and entered into the NIBIN database on October 17, 2025, the day after the arrest and a month before any charging decision. The Sheriff's Office's own written policies confirm the non-evidentiary character of that custody and contain no authorization for that processing. General Order 532.06, Firearms Collection, Submission, Maintenance, Release, and Disposal (effective September 6, 2024), classifies firearms taken in reference to a Risk Protection Order as "Recovered," a category the policy defines separately from "Evidence: Arrest made or to be made." Neither General Order 532.06 nor General Order 312.06, Risk Protection Orders (effective June 24, 2024), contains any provision authorizing the test-firing of firearms held under a Risk Protection Order. General Order 312.06 further requires that all property receipts for property seized pursuant to a Risk Protection Order clearly indicate that a Risk Protection Order has been entered; the October 17, 2025 receipt for the five firearms instead recorded the type of case as "Aggravated Assault w/ firearm." General Order 532.06 likewise requires that all ammunition seized pursuant to a Risk Protection Order, including the contents of magazines, be detailed by both quantity and type, with magazines unloaded and the rounds counted; the receipt instead recorded item 6 as a bag of magazines in five calibers by gross weight, 19.5 pounds, with no round counts.

53. The Sheriff's Office obtained a Risk Protection Order based on the same events and the same account. The petition was filed by the Sheriff's Office at 10:08 a.m. on October 17, 2025,

hours after the search of Plaintiff's home, and it rested on the arrest and on the version of events set out in Defendant Gerbasi's probable cause affidavit. But for the arrest and the affidavit, no petition would have been filed and no order would have issued. The sworn Risk Protection Order affidavit left the firearms fields blank and answered the concealed weapon license field "UNKNOWN," though Plaintiff had disclosed that license to Defendant Fisher on body-worn camera approximately fourteen hours earlier. An Agreed Order Without Findings was entered in February 2026, in which the court made no factual findings and Plaintiff admitted no facts. Plaintiff does not ask this Court to review or set aside that order; he alleges that the proceeding and the deprivations that followed from it were proximately caused by the constitutional violations described above. The order expired by its terms on June 18, 2026. On June 19, 2026, the day after the order expired, Plaintiff requested the return of his property; the agency advised that return was subject to an approximately twelve-week backlog with no mechanism for tracking the request. The firearms and ammunition were released to Plaintiff on July 21, 2026, and his Global Entry membership was revoked on October 21, 2025, before any disposition of the charge.

**COUNT I**

**FOURTH AMENDMENT FALSE ARREST, 42 U.S.C. § 1983**

**(Against Defendants Yerian, Fisher, Dory, Forges, and Gerbasi)**

54. Plaintiff realleges paragraphs 1 through 53 as if fully set forth herein.

55. At all relevant times the Defendants acted under color of state law.

56. The Defendants arrested Plaintiff and caused him to be detained without a warrant.

57. The arrest was not supported by probable cause or arguable probable cause. Before any deputy arrived, dispatch had broadcast that the 911 caller was armed, and Plaintiff had been instructed by the dispatcher to secure the firearm and had done so. Before the arrest, the Defendants

knew that Plaintiff was the complainant reporting an attempted burglary; that he had detained R.K. while summoning and remaining on the line with 911; that he denied pointing the firearm, a denial one deputy answered with the words "No, I believe you"; that an independent eyewitness to the encounter was present and identified; and that Plaintiff's surveillance footage existed, portions of which deputies personally viewed inside Plaintiff's home and used to clear R.K. of the reported burglary. Having relied on Plaintiff's own footage to resolve Plaintiff's complaint in R.K.'s favor, the Defendants disregarded the same footage, and every other item of exculpatory information in their possession, in assessing R.K.'s accusation against Plaintiff. The conduct Plaintiff had observed and reported, nighttime entry onto private residential property by individuals with concealed faces, manipulation of his door handle, and the same juvenile's appearance at a second neighbor's door and movement behind that neighbor's residence, was at minimum unlawful whatever its motive, and Plaintiff's threatened use of force to detain a suspected burglar while summoning police was lawful under Florida law. Under section 776.032(2), Florida Statutes, a law enforcement agency may not arrest a person for using or threatening to use force unless it determines that there is probable cause that the force used or threatened was unlawful. On the information known to the Defendants, no such probable cause existed. The Defendants' failure to question the known and available eyewitnesses before the arrest, the only eyewitness interview that night having occurred at Plaintiff's own instigation from the back of a patrol vehicle, did not create probable cause; it reflected that the decision to arrest had already been made.

58.. Each Defendant personally participated in the seizure, with individualized knowledge of the exculpatory information then available:

(a) Defendant Yerian received by radio, from Defendant Fisher inside Plaintiff's home, the substance of Plaintiff's statements, including his denial that he pointed

the firearm; personally elicited the subjective-fear element from R.K. through leading questions at approximately 20:46; and at approximately 20:57, within minutes of that exchange, directed that Plaintiff be detained and placed in a patrol vehicle.

(b) Defendant Fisher was present inside Plaintiff's home, personally viewed Plaintiff's surveillance footage there, heard Plaintiff's denials, relayed that information by radio to Defendant Yerian, and, with Defendant Forges, placed Plaintiff in handcuffs at approximately 20:59. Eyewitnesses to the encounter were visibly present on scene, as captured on body-worn camera, and Fisher did not interview any of them or ask any of them to remain before the arrest.

(c) Defendant Dory was among the first deputies on scene, personally detained and handcuffed R.K., was present for Plaintiff's exculpatory statements, conducted the first recorded interview of Mr. Silvers described in paragraph 29, and transported Plaintiff to jail notwithstanding the exculpatory information he had personally received. Eyewitnesses to the encounter were visibly present on scene, as captured on body-worn camera, and Dory did not interview any of them before Plaintiff was handcuffed.

(d) Defendant Forges was among the first deputies on scene, jointly placed Plaintiff in handcuffs with Defendant Fisher at approximately 20:59, and authored the offense report. Eyewitnesses to the encounter were visibly present on scene, as captured on body-worn camera, and Forges did not interview any of them or ask any of them to remain before the arrest.

59. Defendant Gerbasi, upon arriving after the handcuffing, swore a probable cause affidavit that supplied the stated basis for Plaintiff's continued detention, which continued for approximately twenty-four hours.

60. No reasonable officer in the Defendants' position could have believed there was probable cause or arguable probable cause to arrest Plaintiff on these facts.

61. At the time of the arrest, the law was clearly established that an officer may not choose to disregard exculpatory information known to and possessed by him in assessing probable cause, Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004), and that under section 776.032(2), Florida Statutes, a person who has threatened force in defense of himself or his property may not be arrested absent probable cause that the threatened force was unlawful. A reasonable officer in the Defendants' position would have understood that arresting Plaintiff on the information described above violated these principles.

62. As a direct and proximate result, Plaintiff was unlawfully seized and detained and suffered the injuries alleged herein.

**COUNT II**

**FOURTH AMENDMENT MALICIOUS PROSECUTION, 42 U.S.C. § 1983**

**(Against Defendants Gerbasi, Yerian, and Forges)**

63. Plaintiff realleges paragraphs 1 through 53 as if fully set forth herein.

64. At all relevant times the Defendants acted under color of state law.

65. The Defendants instituted and continued a criminal prosecution against Plaintiff for aggravated assault with a firearm.

66. The Defendants caused that prosecution through a probable cause affidavit and supporting reports that contained knowing or reckless misrepresentations and omitted material exculpatory facts within the Defendants' knowledge.

67. The misrepresentations and omissions included the following:

(a) The affidavit attributed to Plaintiff an admission that he "went too far," which Plaintiff never made. The phrase originated with the detective, who used it himself in speaking to Plaintiff earlier that evening on a fleet camera recording. The affidavit converted the affiant's own characterization into a quoted admission by the accused.

(b) The affidavit omitted R.K.'s sworn statements, recorded on Gerbasi's own body-worn camera, that he believed the firearm was a BB gun, that he believed being shot with it would not seriously hurt him, and that he realized it was real only after deputies arrived, facts bearing directly on the fear element of the charged offense.

(c) The affidavit omitted the identities of E. and T.S., the two companions R.K. named to Defendant Yerian before the arrest and to Gerbasi under oath, including T.S., whom R.K. identified as the individual involved at the door; neither was ever contacted.

(d) The affidavit omitted that Mr. Silvers twice declined to confirm that Plaintiff had pointed the firearm, first at approximately 21:53 in an interview recorded on Defendant Forges's body-worn camera, and again at approximately 23:28 to Gerbasi directly.

(e) The affidavit omitted the existence of Mr. Garlobo's independent Ring camera entirely; omitted that deputies had viewed Plaintiff's home security footage at the scene and relied on it to clear R.K.; omitted that Gerbasi personally viewed that footage during the recorded interview and declined to collect it; and characterized the footage as not showing anyone attempting to open or damage the door, when the footage shows the concealed individual reaching for the door handle.

(f) The affidavit omitted D.K.'s pre-arrest statement, recorded on body-worn camera, that the incident was "the boy's fault."

(g) The affidavit omitted Mr. Silvers's account that R.K. had appeared at Silvers's own front door and had been moving behind his residence in the dark.

(h) Defendant Forges's initial offense report, dictated approximately one hour after the first Silvers interview was recorded on Forges's own body-worn camera, omitted the eyewitness and his statement entirely, recorded that no witness to the crime was known, attributed to Plaintiff a minimizing description of the video footage that Plaintiff never gave, omitted Forges's own recorded assessment described in paragraph 23, and stated that "BODY-WORN CAMERA (BWC) WAS ACTIVATED THROUGHOUT THE ENCOUNTER," a statement contradicted by the muted intervals and recording gaps on Forges's own device and across the scene described in paragraphs 20, 23, 26, and 78.

(i) The affidavit repeated R.K.'s claim that the group did not approach the back of any residence while omitting that R.K. was encountered and detained behind a residence, that the offense report records him attempting to hide behind a bush, that Silvers described him moving around and behind Silvers's own residence, and that

Plaintiff's camera footage captured the group traveling through backyard areas on both approaches.

(j) The affidavit stated that R.K. "ran toward law enforcement officers for safety," framing R.K.'s departure as flight from danger. The recordings do not support that characterization. The arriving deputy's own body-worn camera captured R.K. walking calmly toward him while using his phone, and the neighboring Ring camera captured the same. The affidavit adopted a characterization the agency's own recordings contradict.

(k) The affidavit relayed R.K.'s claim that Plaintiff "grabbed his shoulder and attempted to push him down," while omitting that R.K. contradicted that claim in the same sworn interview. Asked whether Plaintiff was making him go up and down, R.K. answered, "No, he's not making me. That's my decision," and described standing up repeatedly of his own accord. R.K. also qualified the assertion as he made it, saying Plaintiff "kind of like started like pushing me, like not pushing me." The affidavit further omitted that Plaintiff expressly denied any physical contact, stating "I never grabbed him" in his recorded interview, and that Mr. Silvers, who was present, described Plaintiff telling R.K. only to "stay where you're at" and stated that Plaintiff "didn't make him sit."

68. The subjective-fear element of the charged offense was elicited from R.K. through leading questions by Defendant Yerian, as recorded on Yerian's body-worn camera, rather than from any spontaneous account. In R.K.'s first recorded account, given to the first deputies on scene, R.K. spontaneously described his own conduct, acknowledged that the prank "wasn't a smart choice," stated that he initially thought Plaintiff was a police officer, and hedged his

description of the firearm, stating "it's not full-on." The escalated description of the firearm's movement appeared for the first time in Defendant Gerbasi's interview more than two and a half hours after that first account.

69. Had the affidavit stated the facts truthfully and completely, it would not have established probable cause for aggravated assault with a firearm. The materiality of the misrepresentations is not hypothetical: when the assigned prosecutor reviewed the same surveillance footage that the affidavit characterized as not showing an attempted entry, she documented that the footage made Plaintiff's belief that a break-in was occurring reasonable, and the charge was declined.

70. The continuation of the prosecution cannot be attributed to independent prosecutorial judgment. No prosecutor reviewed the evidence before the arrest or before the affidavit issued. The State Attorney's Office twice demanded the case evidence in writing; the agency's audit records show the case file was first shared with that office on October 30, 2025, after the second demand. Until then, the prosecution was maintained on the affidavit alone, and within nineteen days of finally receiving the case materials, the State Attorney's Office declined the charge. An intermediary's judgment breaks the chain of causation only when that judgment is informed, and the prosecutor's judgment here was procured and sustained by the same misrepresentations and withholding alleged above. When the State Attorney's Office obtained the true facts, it declined the charge.

71. The Defendants acted with malice. On the night of the incident, Defendant Yerian demanded a charging decision from R.K.'s mother within approximately five minutes, telling her, "We need to get him in handcuffs." On October 24, 2025, she signed a Refusal to Prosecute, which Defendant Gerbasi personally obtained and witnessed, and the prosecution nonetheless continued

for twenty-five more days. Defendant Gerbasi also represented to command staff that Plaintiff had "chased" the juveniles, a characterization the complainant himself had denied on camera. While the prosecution remained pending, Defendant Gerbasi ignored the assigned prosecutor's documented direction to obtain the neighbor's Ring camera footage of the encounter.

72. The prosecution terminated in Plaintiff's favor on November 18, 2025, when the State Attorney's Office declined to file the charge for insufficient evidence.

73. At the time of the affidavit, the law was clearly established that an affiant may not include in a warrant affidavit statements he knows to be false or makes with reckless disregard for the truth, and may not omit facts a reasonable officer would know are material, Franks v. Delaware, 438 U.S. 154 (1978), and that a seizure pursuant to legal process procured through such fabrications or omissions violates the Fourth Amendment, Williams v. Aguirre, 965 F.3d 1147 (11th Cir. 2020).

74. Legal process issued against Plaintiff on the strength of the affidavit Defendant Gerbasi swore. The affidavit was the charging document presented to a judicial officer at Plaintiff's first appearance; the judicial officer relied on it, declined to release Plaintiff, and set bond at $10,000. Plaintiff was thereafter held in physical custody pursuant to that judicial determination until he posted bond, and the prosecution initiated by the affidavit remained pending against him for thirty-three days, until the State Attorney's Office declined to file the charge on November 18, 2025. Plaintiff was therefore seized within the meaning of the Fourth Amendment pursuant to legal process, and that seizure was procured by the misrepresentations and omissions described above. Plaintiff suffered the injuries alleged herein.

**COUNT III**

## MUNICIPAL LIABILITY UNDER MONELL: UNCONSTITUTIONAL CUSTOM, 42 U.S.C. § 1983

### (Against Defendant Bradshaw in his official capacity)

75. Plaintiff realleges paragraphs 1 through 53 as if fully set forth herein.

76. This claim is brought against Defendant Bradshaw in his official capacity. An official-capacity claim against the Sheriff is a claim against the Palm Beach County Sheriff's Office. Under Florida law, the elected Sheriff is the final policymaker for the law enforcement functions of his office.

77. At all relevant times the Palm Beach County Sheriff's Office maintained a custom and practice of suppressing and failing to disclose exculpatory evidence in criminal investigations, and of selectively muting, deactivating, and mislabeling body-worn camera recordings in a manner that obscured exculpatory content.

78. That custom is reflected in the following documented facts in Plaintiff's case:

(a) Body-worn cameras worn by deputies present on October 16, 2025 were muted or deactivated during material portions of the encounter, including the devices assigned to Defendants Fisher, Dory, and Forges. The muting began during the pre-arrest investigative window. Defendant Fisher's device, serial D01AG774Z, displays the on-screen indicator "MUTED" beginning at 20:14:25, engaging immediately after the recorded exchange described in paragraph 20 and while Defendant Forges's telephone report concerning Plaintiff's surveillance footage was in progress. Defendant Forges's device, serial D01AE730P, displays the indicator "MUTED" at 20:22:28, 20:23:04, 20:29:26, and 20:30:48; Defendant Yerian appears in frame during the muted interval at 20:22:28, more than twenty

minutes before Yerian's own body-worn camera began recording at 20:43:06. Defendant Dory's device, serial D01AE786P, displays the indicator "MUTED" at 20:24:33, with Defendant Fisher in frame. Each of these muted intervals preceded Plaintiff's handcuffing at approximately 20:59 and occurred during the period in which the deputies' account of the encounter was being formed and relayed. Forges's device again displays the indicator "MUTED" continuously from at least 21:01:55 through 21:02:56, a span of at least sixty-one seconds beginning approximately three minutes after Plaintiff was handcuffed; the full duration of each muting is determinable from the recordings themselves and from the agency's device audit logs. The pattern extended across the entire scene. According to the agency's own evidence metadata, in the investigative window preceding Plaintiff's arrest the responding deputies other than the individual Defendants produced a total of nine recordings amounting to approximately twenty-one minutes, on a scene staffed by more than twenty deputies; the longest of the nine runs five minutes and eighteen seconds and is titled "31 0/Dash Cam Driving cancelled before arrival No Use," and the shortest runs thirty-nine seconds. The same metadata shows two intervals in which no device anywhere on the scene was recording: 20:34:22 to 20:37:47, and 20:52:16 to 20:55:28, the three minutes immediately preceding the recording that captures Plaintiff's handcuffing. During the 21:01:55 muted interval the recording depicts on-scene contact with witnesses including R.K.'s mother, and depicts Defendant Forges standing in close conversation with Defendants Yerian and Fisher. The video from that period was preserved; the audio was not. The conversation among the deputies who directed and effected Plaintiff's arrest,

occurring minutes after the arrest, was thereby recorded without sound. Muting recurred during the execution of the search warrant hours later. Body-worn camera serial D01AH5476 records audio at 01:09:29 on October 17, 2025 and displays the indicator "MUTED" four seconds later, at 01:09:33, and remains muted at 01:10:30. The audio captured immediately before the mute engaged records one detective telling another, in substance, that he should go on mute, and the camera wearer responding that he did not know how to do so on that device, whereupon the first detective demonstrated the function. The exchange establishes that muting was a known and shared practice among Sheriff's Office personnel rather than an isolated act, and that officers instructed one another in its use. The muted recording then depicts that detective approaching and speaking with two civilians outside Plaintiff's residence at 01:10:24, identified by Plaintiff as his mother and his neighbor Ms. Hall. That contact occurred in the minutes immediately preceding the officers' entry into Plaintiff's residence to seize the firearms. Their statements were not recorded, and no report documents what either woman said. The muting continued inside the residence. A third device, body-worn camera serial D01AG742Z, records audio at the threshold of Plaintiff's home at 01:11:03 and displays the indicator "MUTED" by 01:11:37, after entry. Four detectives entered and searched the home, and no body-worn camera produced by the Sheriff's Office recorded audio from inside the residence at any point during the search.

(b) The Palm Beach County Sheriff's Office applied its own institutional classifications of "NO_EVIDENCE" and "NO_EVIDENTIARY_VALUE" to body-worn camera files that contained exculpatory material, including the file

containing the first recorded interview of Mr. Silvers described in paragraph 29, the backup detective's body-worn camera recording of Mr. Silvers's 23:28 interview, and other files associated with Defendant Forges. Those labels were applied by the agency within its own records system and produced in that form. The agency's Evidence.com audit trail further shows that multiple recordings originally titled with the neutral dispatch designation "31 0 - ASSAULT ARMED" bore the titles "NO VALUE" and "DASH CAM NO VALUE" by the time Defendant Gerbasi assembled the case file on October 21, 2025, in a batch of evidence additions logged within a two-second window. Among the retitled files, the only recording that captures Plaintiff's handcuffing, the recording from Defendant Forges's device beginning at 20:55:28 described in paragraph 26, bears the agency title "NO EVIDENCE."

(c) The State Attorney's Office issued two written demands for evidence, dated October 21, 2025 and October 29, 2025, and the agency's Evidence.com audit trail shows the case file was not shared with that office until October 30, 2025, after the second demand. The audit trail further shows that the shared packet comprised the 46 evidence items then in the case file, and that the recording of Plaintiff's 911 call, in which Plaintiff told the call-taker that three neighbor witnesses were present with him, was not added to the case file until October 31, 2025, the day after the share; the State Attorney's copy was not updated until November 8, 2025. The charge was thereafter declined for insufficient evidence.

(d) During the execution of the search warrant, as captured on the recording described in paragraph 51, an officer stated, "you have to hit save as and put it under

a different case," and agency records show the firearms seized under the warrant logged under multiple case numbers.

79. On information and belief, the custom described above extends beyond Plaintiff's case and constitutes a persistent and widespread practice within the Palm Beach County Sheriff's Office. The basis for this belief includes Cassini v. Bradshaw, No. 9:26-cv-80234 (S.D. Fla.), a pending federal action against the same Sheriff's Office arising from a separate arrest, in which the plaintiff alleges that a Sheriff's Office detective fabricated the contents of a probable cause affidavit and that the State Attorney thereafter dismissed the charges. On information and belief, the Sheriff's Office opened an internal investigation of the detective who swore that affidavit after the dismissal became a matter of public attention. No comparable inquiry occurred in Plaintiff's case. Despite the documented misstatements in the affidavit sworn against Plaintiff, the muting of body-worn cameras, the classification of exculpatory recordings as having no evidentiary value, and the State Attorney's declination for insufficient evidence, no defendant was investigated or disciplined for any of that conduct. The mechanism alleged there is the mechanism documented here: a sworn charging affidavit containing assertions the agency's own recordings and records do not support, followed by dismissal once the prosecutor obtained the underlying evidence. The full scope of the practice is provable only through records within the exclusive control of the Sheriff's Office, including body-worn camera audit and mute logs, evidence-labeling and chain-of-custody records, and internal disciplinary files, and is a proper subject of discovery.

80. The practice was sufficiently persistent and widespread that the Sheriff, as final policymaker, had actual or constructive knowledge of it and was deliberately indifferent to its known and obvious consequences, including the arrest and prosecution of persons on fabricated or materially incomplete records.

81. The custom was the moving force behind the violation of Plaintiff's Fourth Amendment rights, and caused and prolonged his wrongful arrest and prosecution.

82. As a direct and proximate result, Plaintiff suffered the injuries alleged herein.

## COUNT IV

## MUNICIPAL LIABILITY UNDER MONELL: FAILURE TO SUPERVISE AND DISCIPLINE, 42 U.S.C. § 1983

**(Against Defendant Bradshaw in his official capacity)**

83. Plaintiff realleges paragraphs 1 through 53 as if fully set forth herein.

84. This claim is brought against Defendant Bradshaw in his official capacity as the final policymaker for the Palm Beach County Sheriff's Office.

85. The Palm Beach County Sheriff's Office failed to supervise and discipline its deputies and detectives with respect to the disclosure of exculpatory evidence, the accurate preparation of probable cause affidavits, and the proper activation, retention, and labeling of body-worn camera recordings.

86. The need for supervision and discipline in these areas was obvious. On information and belief, and as reflected in the parallel allegations in Cassini v. Bradshaw, the muting and mislabeling of exculpatory footage and the omission of exculpatory facts from charging documents were sufficiently widespread that the failure to supervise or discipline that conduct amounted to deliberate indifference to the rights of persons investigated and arrested by the agency.

87. In Plaintiff's case, no supervisor corrected the muting and mislabeling of body-worn camera footage, the omission of known exculpatory facts from the probable cause affidavit, or the non-submission of evidence to the prosecutor. To the contrary, the on-scene supervisor was present during the practice: Defendant Yerian, the supervising sergeant, appears in frame of Defendant

Forges's muted body-worn camera at 20:22:28, more than twenty minutes before Yerian's own camera began recording, and the recordings produced from Yerian's device total five minutes and one second across the entire engagement according to the agency's own evidence metadata. On information and belief, no deputy or detective involved was disciplined for any of that conduct. The records that would demonstrate the presence or absence of supervision and discipline, including supervisory review logs and disciplinary files, are within the exclusive control of the Sheriff's Office.

88. The failure to supervise and discipline was the moving force behind the violation of Plaintiff's Fourth Amendment rights and the prolongation of his prosecution.

89. As a direct and proximate result, Plaintiff suffered the injuries alleged herein.

**COUNT V**

**FOURTH AMENDMENT UNLAWFUL SEIZURE AND RETENTION OF PROPERTY, 42 U.S.C. § 1983**

**(Against Defendant Gerbasi)**

90. Plaintiff realleges paragraphs 1 through 53 as if fully set forth herein.

91. At all relevant times Defendant Gerbasi acted under color of state law.

92. Plaintiff's cellular telephone was seized from him at his arrest on October 16, 2025, without a warrant. The seizure was captured on body-worn camera, on which Plaintiff states, "I just have my cell phone on my left-hand side," and a deputy responds, "Let me take it out." During Plaintiff's recorded interview, Defendant Gerbasi returned the telephone to Plaintiff for the purpose of displaying Plaintiff's home security footage, viewed that footage, and then retook and retained the telephone. No warrant ever authorized the seizure or retention of the telephone. Whatever justification existed for taking the telephone from Plaintiff's person at the moment of

arrest did not authorize what followed. Plaintiff was released from custody on October 17, 2025, and the charge was declined on November 18, 2025, yet the telephone was retained until December 4, 2025, forty-nine days after it was taken and sixteen days after the prosecution ended. The retention was independent of the arrest and outlasted any conceivable evidentiary purpose.

93. The only warrant obtained in this matter, search warrant PBSO_2025_008190, authorized seizure of "Firearm(s), Firearm part(s), Firearm Storage Container(s), Ammunition, Shell casings, Firearm Cleaning and Maintenance kit(s), Firearm Documentation." The warrant did not authorize the seizure of a telephone, a cellular device, an electronic device, or digital contents of any kind.

94. The telephone provided live access to Plaintiff's home surveillance cameras, and Gerbasi knew from personally viewing the footage on it that it contained evidence favorable to Plaintiff. It was retained in the custody of the Sheriff's Office and was not logged into evidence until 5:30 a.m. on October 17, 2025, hours after it was taken from Plaintiff and outside the scope of any warrant. The agency's property receipt recorded the telephone as collected during the warrant execution at the residence, a time and place at which the telephone had already been in deputies' custody for hours. Per the agency's internal chain-of-custody records, the telephone was retained for forty-nine days and released to Plaintiff on December 4, 2025, sixteen days after the charge was declined. The retention was also employed as leverage: as alleged in paragraph 50, a detective conditioned faster return of the telephone on Plaintiff's provision of his surveillance footage. The retention thus served an evidentiary bargaining purpose rather than any legitimate custodial one.

95. Defendant Gerbasi took custody of, processed, and retained the telephone, and is identified in the agency's records as the official who submitted it into evidence.

96. In the same matter, the Sheriff's Office seized six firearms and approximately 19.5 pounds of ammunition, which have been retained continuously since October 16, 2025. The criminal charge was declined on November 18, 2025, and the Risk Protection Order entered on the same facts expired by its terms on June 18, 2026. On June 19, 2026, Plaintiff requested the return of his firearms and ammunition from the Sheriff's Office evidence department. The agency advised that return was subject to a background-check and processing backlog of approximately twelve weeks and provided no mechanism for tracking the status of the request. The firearms and ammunition were released to Plaintiff on July 21, 2026: nine months and five days after the seizure, more than eight months after the charge was declined, and thirty-two days after the written return request. The Risk Protection Order authorized the Sheriff's Office to hold Plaintiff's firearms for safekeeping while that order was in effect. It expired on June 18, 2026. From that date forward no order, warrant, or other authority permitted the agency to keep Plaintiff's property, and it nonetheless retained the firearms and ammunition for an additional thirty-three days, including thirty-two days after Plaintiff's written demand for their return. Neither the Risk Protection Order nor any other authority permitted the agency to put the safekeeping-held property to investigative use at any time.

97. Five of the seized firearms were not involved in the underlying incident and were held under the Risk Protection Order for safekeeping. Although the agency's own firearms technician observed in writing that these firearms did not appear to have been used in any offense, the agency swabbed the Glock 23 for DNA on October 28, 2025 and test-fired three of the safekeeping-held firearms, the Glock 23, the Glock 19-pattern pistol, and the PWS MK1, on October 30, 2025 for entry into the National Integrated Ballistic Information Network, as documented in the agency's own case report. The investigative use of property held under a non-investigative, safekeeping

justification was undertaken without any warrant, court order, statutory authority, or owner consent. It was also undertaken outside the agency's own written policies: as alleged in paragraph 52, General Order 532.06 classifies firearms taken in reference to a Risk Protection Order as "Recovered," a category the policy defines separately from "Evidence: Arrest made or to be made," and neither that order nor General Order 312.06 contains any provision authorizing the test-firing of firearms so held. The Sheriff's Office has certified that it has no authorization documentation and no record of supervisor approval for the submission of the safekeeping-held firearms for NIBIN entry and test-firing. The agency's own property receipt form states in bold type that forensic testing "Must Be Requested," that "THIS RECEIPT IS NOT A REQUEST," and lists "Test Fire/NIBIN" among the analyses requiring such a request; no forensic testing request for the safekeeping-held firearms appears in the record the agency has produced. The October 28, 2025 receipt documenting the swabbing of those firearms likewise leaves blank the field designating the recipient of the resulting report. At the time of the property's release on July 21, 2026, Plaintiff asked evidence unit personnel whether the agency normally test-fires weapons held for risk protection orders and safekeeping; the response was that it is "normally the procedure," depending on caliber. That practice is applied to firearms surrendered or seized for non-investigative safekeeping without warrant, court order, statutory authority, or owner consent.

98. No reasonable officer could have believed that the continued retention of Plaintiff's telephone, for which no warrant was ever sought or issued, or the continued retention of Plaintiff's firearms and ammunition after the charge was declined, the Risk Protection Order expired, and a written return request was made, was lawful. Because the arrest itself was unsupported by probable cause, the seizure of the telephone incident to that arrest was likewise unlawful.

99. At the time of the seizure and retention, the law was clearly established that the warrantless seizure and continued retention of personal property, without any warrant or applicable exception, violates the Fourth Amendment, Riley v. California, 573 U.S. 373 (2014), and that property held on a non-investigative safekeeping basis may not be repurposed for criminal investigation, Caniglia v. Strom, 593 U.S. 194 (2021).

100. As a direct and proximate result, Plaintiff was deprived of his property and suffered the injuries alleged herein.

**DAMAGES**

101. As a direct and proximate result of the Defendants' conduct, Plaintiff suffered the following injuries and damages.

102. Plaintiff was unlawfully seized and detained in custody for approximately twenty-four hours, including approximately six hours confined in a patrol vehicle without access to water or a restroom. During his detention, Plaintiff's dogs, including an elderly disabled dog requiring daily medication, were left without care until a neighbor could be arranged to attend to them.

103. Plaintiff incurred a nonrefundable premium of $1,000 paid to a bail bondsman on a $10,000 bond to secure his release. Because his cellular telephone was being retained as evidence, Plaintiff obtained a replacement telephone on October 18, 2025, the day after his release from custody, financing its $1,199.99 price through a twenty-four-month carrier installment plan on which Plaintiff continues to make monthly payments, and paying $84.00 in sales tax at the time of purchase. The seized telephone was one Plaintiff had purchased new for $1,282.93 approximately one year earlier. When it was returned on December 4, 2025, Plaintiff, having already been forced to replace it, sold it on December 31, 2025 for $500 to offset the cost of the replacement.

104. Plaintiff suffered the loss of his business. Tech-Savers Solutions, Inc., the business Plaintiff operated at the time of the arrest, experienced a decline in monthly revenue from approximately $2,728 to approximately $623 and ceased operations. Plaintiff started a successor business, Digital Solution Advisors, which has not been able to establish viable revenue. After the arrest became publicly visible, pending customer estimates failed to convert at an abnormal rate, and prospective clients declined Plaintiff's services for stated reasons inconsistent with the surrounding circumstances. The publicly accessible arrest record and associated media coverage continue to impair Plaintiff's ability to obtain and retain clients.

105. Plaintiff suffered reputational harm as a consequence of the wrongful arrest and prosecution, including through the publicly accessible arrest record and media coverage across numerous outlets.

106. Plaintiff suffered emotional distress, including anxiety, humiliation, and loss of sleep, of the kind ordinarily attendant to a wrongful arrest and prosecution.

107. The arrest has deterred Plaintiff from contacting law enforcement. On May 8, 2026, at approximately 1:57 a.m., Plaintiff's security cameras captured a person unknown to Plaintiff walking through Plaintiff's back yard, within feet of his screened patio, and then testing the doors of vehicles parked near the front of the residence, including a vehicle belonging to a neighbor, before leaving through the hedge line. Plaintiff observed the intrusion and did not report it because he feared further retaliation by the Palm Beach County Sheriff's Office, whose deputies had arrested him the last time he called 911. The arrest of Plaintiff while he was the 911 complainant has chilled his willingness to report suspected criminal activity.

108. Plaintiff's firearms and ammunition, consisting of six firearms and approximately 19.5 pounds of ammunition, were seized and retained continuously by the Palm Beach County

Sheriff's Office from October 16, 2025 until their release on July 21, 2026, and firearms not involved in the underlying incident, held under the Risk Protection Order for safekeeping, were subjected to investigative forensic processing.

109. Plaintiff's Global Entry membership was revoked on October 21, 2025, before any disposition of the charge, and Plaintiff, a concealed-weapon license holder who had disclosed that license to deputies on the night of the incident, was barred from lawfully possessing or carrying any firearm from the date of the arrest until the risk protection order expired on June 18, 2026.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Santiago Cairo respectfully requests that this Court:

(a) Enter judgment against the Defendants and award compensatory damages in an amount to be determined at trial;

(b) Award punitive damages against the individual Defendants Gerbasi, Yerian, Fisher, Dory, and Forges;

(c) Enter a declaratory judgment that Plaintiff's arrest was not supported by probable cause and that the probable cause affidavit contained material misrepresentations and omissions, and such further declaratory relief as is just and proper;

(d) Order the return of any of Plaintiff's property that remains in Defendants' possession, and the destruction or return of any ballistic, biological, or digital data derived from Plaintiff's property, including any cartridge casings, test-fire records, and NIBIN database entries generated from the firearms seized from Plaintiff;

(e) Award Plaintiff his reasonable attorney's fees and costs under 42 U.S.C. § 1988; and

(f) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Santiago Cairo
Plaintiff, Pro Se
4025 N. Federal Hwy., Apt. 325C
Fort Lauderdale, FL 33308
561-261-7350
Email: santiownz@gmail.com

Dated: 08/17/26